ADAM GORDON
United States Attorney
JOHN PARMLEY
Assistant United States Attorney
California State Bar No. 178885
Email: John.Parmley@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: 23-CR-1471-H |
|---|---|
| Plaintiff, | **UNITED STATES' SUPPLEMENTAL BRIEFING REGARDING ABUSE OF POSITION OF TRUST AND ACCEPTANCE OF RESPONSIBILITY ADJUSTMENTS** |
| v. | |
| JINCHAO WEI, a.k.a. Patrick Wei, | |
| Defendant. | |

COMES NOW, the plaintiff, United States of America, by and through its counsel, Adam Gordon, United States Attorney, John Parmley, Assistant United States Attorney, and hereby files its Supplemental Briefing regarding sentencing issues in response to the Court orders issued at ECF Nos. 175, 176, and 177.

**Background**

This case is set for sentencing on January 12, 2026. This brief is in response to the Court's Orders, dated January 8, 2026, [ECF 176 and 177] asking for further briefing on the appropriateness of an upward adjustment for abuse of position of trust. The court also ordered that the United States be prepared to address Defendant's request for acceptance of responsibility at the sentencing hearing. [ECF 175.] This document includes arguments related to that issue as well.

//

//

## ABUSE OF POSITION OF TRUST

### Relevant Facts

Defendant joined the U.S. military in 2021. Pretrial Services Report ("PSR") ¶ 158. As a uniformed member of the U.S. military, Defendant not only swore an oath to protect and defend the United States but also acknowledged that "[s]ervice in the United States Navy or Naval Reserve place[d] [him] in a position of special trust and responsibility." Gov't Ex. 1 (Defendant's Enlistment Files) at 3. Defendant also received a U.S. security clearance that authorized him to access national security information classified up to the SECRET level. *Id.* ¶ 5. He was eligible for this clearance because the U.S. Department of Defense ("DoD") concluded that under the applicable federal regulations, *see* 5 C.F.R. 732, Defendant's role in the U.S. Navy was a "national security position" in which the "nature of the work performed" by Defendant "could bring about an adverse effect on the national security" of the United States. Gov't Ex. 2 (Defendant's SF-86 Application for Security Clearance) at 2.

Defendant quickly promoted in the Navy and at the time he was arrested in August 2023, he held the midlevel rank of E-5 Petty Officer 2nd Class. This rank is equivalent to a Sergeant in the Army or Marine Corps. According to a DoD website explaining the ranks, beginning at the rank of E-4 in the Navy (which Defendant held before his current rank), "[l]eadership responsibility significantly increases in the midlevel enlisted ranks. This responsibility is given formal recognition by use of the terms noncommissioned officer and petty officer."[1] Current average compensation for an E-5 in the Navy is $110,200.[2]

Defendant's job in the Navy was as a Machinist's Mate. Gov't Ex. 1 at 13. Witnesses at trial explained that a Machinist's Mate is essentially a ship's engineer. After completing basic training, Defendant attended Surface Warfare Engineering School for a few months to learn how to operate and maintain the complex and expensive power plants that generate

---

[1] https://www.war.gov/Resources/Insignias/.
[2] https://www.navy.com/careers-benefits/pay.

2

electricity and propel U.S. Navy warships through the water. Gov. Ex. 3 (Defendant's Personnel Jacket) at 14. After completing Surface Warfare Engineering School, Defendant continued his training and developed expertise operating the steam propulsion plant on the U.S.S. Essex. *Id.* at 10-13. He continued to receive formal certifications and qualifications, including a "Team Leader" qualification in December 2022. *Id.* at 8. At the time of his arrest in August 2023, Defendant was responsible for managing the efforts of a handful of more junior Machinist's Mates working in his department.

## Argument

Defendant qualifies for a two-point enhancement under guideline § 3B1.3 because he abused his position of public trust and used a special skill in a manner that significantly facilitated the commission or concealment of his offenses. Defendant objects to this enhancement and argues that he possessed "very little discretionary authority" and that his "activities were limited to those directly ordered of him and he did not control the actions of others." [ECF 159 at 6.] He also argues that his "duties were relegated to relatively menial tasks" and that his "position did not require any specialized training or knowledge." [*Id.*] This is factually untrue. Defendant held a midlevel rank of E-5 and was responsible for maintaining and operating the power plant on a 40,000-ton warship that costs over $1 billion to build and can carry 2,500 sailors and Marines, as well as dozens of aircraft, landing craft, and armored vehicles, around the world. While the steam propulsion technology on the U.S.S. Essex is commonly understood within shipbuilding circles, it is still a very complex system to operate. That is why Defendant went to Surface Warfare Engineering School for months to learn the basics and why his training continued while he served in the Navy. Simply because Defendant worked on a team and had a more senior ranked sailor above him does not mean that he had "very little discretionary authority." Indeed, Chief Francisco Ceja at trial testified that the engineering department on the Essex was approximately 200 sailors and that Defendant was a rising star within the department. The Commanding Officer of the Essex, Captain Aaron Taylor, also testified that Defendant had received a "Warrior of

the Day" award to acknowledge his achievements. *See* Gov't Ex. 29 (Photograph of Warrior of the Day Award). During Captain Taylor's testimony, the Government showed the jury Defendant's promotion letter to E-4, which was signed by Captain Taylor and stated that Defendant's "appointment carries with it the obligation that you exercise increased authority and willingly accept greater responsibility." Gov't Ex. 28. It further stated that Defendant was "[o]ccupying now a position of greater authority." *Id.*

Defendant was an engineer on a complex warship that requires hundreds of sailors to operate. While his role was narrow, it was vitally important. As the jury learned, Defendant worked in the power plant of the ship. That system powered all the other systems on the ship including the engine, flight operations, desalination, and weapons. He received specialized training on how to operate and maintain the ship's propulsion system and, at the time he was arrested, had become a midlevel petty officer responsible for managing more junior sailors. His job as a Machinist's Mate is what gave him access to the thousands of pages of sensitive and export-controlled national defense information about amphibious assault ships that he sold to the Chinese government. But for his role as a Machinist's Mate, he would not have had access to the Essex's engineering department and its technical and operating manuals.

In addition to his role as a U.S. Navy sailor, his specialized training as a Machinist's Mate, and his midlevel supervisory rank of E5, Defendant also had a SECRET U.S. security clearance that placed him in an even greater position of trust and responsibility. As defined under federal regulations, Defendant held a "national security position." This means that his position involved "activities of the Government that are concerned with the protection of the nation from foreign aggression or espionage, including development of defense plans or policies, intelligence or counterintelligence activities, and related activities concerned with the preservation of the military strength of the United States." 5 C.F.R. § 732.102(a)(1). This alone justifies application of § 3B1.3. *See, e.g.*, *United States v. Schultz*, Case No. 3:24-cr-00056, ECF 50 (M.D. Tenn.) (3B1.3 applied to Army Sergeant (E-5) with national

security clearance convicted of conspiring to disclose national defense information); *United States v. Teixeira*, Case No. 1:23-cr-10159 (D. Mass), ECF 156 (3B1.3 applied to Air Force Airman (E-3) with national security clearance convicted of disclosing national defense information); *United States v. Hoffman*, Case No. 2:12-cr-00184, ECF 147 (E.D. Va.) (3B1.3 applied to Navy Petty Officer (E-6) with national security clearance convicted of attempting to disclose national defense information to benefit Russia).

In its order requesting further briefing on guideline 3B1.3, the Court specifically requested briefing on the Commentary Note 1 to 3B1.3, the Third Circuit case *United States v. Douglas*, 885 F.3d 124 (3d Cir. 2018) (en banc), and the First Circuit case *United States v. Parrilla Roman*, 485 F.3d 185 (1st Cir. 2007). [ECF 177 at 2.] None of these authorities counsels against applying the enhancement here.

*First*, despite how Defendant now describes his job in the Navy, he did not hold a menial position with no discretionary authority. As described above, he was a midlevel enlisted sailor responsible for operating arguably the most important piece of technology on the Essex. While he may have been given general orders to complete certain tasks (*e.g.*, evaluate and assess why a particular boiler is not generating the correct amount of pressure), he was given a great deal of discretion to use his own judgment to execute those orders. As he was promoted in the Navy, he gained more and more responsibility and discretion to act as an engineer. This greater responsibility allowed Defendant to commit his crimes by access to the protected information and the ability to conceal his theft. For example, as a petty officer, he had access to the engineering department's log room where he could, at a time of his pleasing, log into the ship's protected computer network and exfiltrate Navy documents to his personal email account. This privilege was not granted to all sailors on the Essex.

*Second*, the defendants in *Douglas* and *Parrilla Roman* are not analogous to Defendant. In *Douglas*, the defendant was an airline mechanic convicted of conspiring to smuggle drugs through the airport where he worked. 885 F.3d at 127-28. In a split en banc

opinion, the majority adopted a two-part test under 3B1.3: "whether the defendant had the power to make decisions substantially free from supervision based on (1) a fiduciary or fiduciary-like relationship, or (2) an authoritative status that would lead his actions or judgment to be presumptively accepted." *Id.* at 133. The majority held that Douglas did not satisfy that test, in part, because the record did "not establish that Douglas's job required him to exercise *any* judgment." *Id.* at 135-36 (emphasis added).

Similarly, the defendants in *Parrilla Roman* were baggage clerks for an airline convicted of smuggling drugs through their airport. 485 F.3d at 187-88. Their responsibilities included, among others, "loading and unloading cargo," "cleaning the interior surfaces of passenger aircraft," and "guid[ing] aircraft through ground-level arrival and departure maneuvers." *Id.* at 188. They earned between $10 and $12.50 an hour. *Id.* The First Circuit concluded that, as baggage clerks, the defendants' position was not "characterized by professional or managerial discretion and minimal supervision." *Id.* at 190-92.

Here, the facts are different. As a member of the U.S. Navy and SECRET security clearance holder, Defendant had a fiduciary-like relationship with the U.S. Navy. He was sworn to protect the U.S. and the sensitive information he was given. If necessary, he was called to fight and die for the United States. Also, as a midlevel petty officer, his decisions as a Machinist's Mate were presumptively accepted. He was expert on the Essex's propulsion system. He oversaw more junior sailors and other sailors on the ship deferred to his judgment regarding the Essex's propulsion system because of his rank and special training. As Captain Taylor told Defendant, once Defendant became a petty officer, he was occupying a "position of greater authority" and was empowered (and expected) to exercise that greater authority. Gov't Ex. 28. Defendant's role as a petty officer was more akin to a mid-level manager than a clerk.[3]

---

[3] Although the courts in *Douglas* and *Parrilla Roman* used the phrase "security clearance" to refer to special privileges that the defendants in those cases had, such clearances are categorically different than

6

  Moreover, *Douglas* and *Parrilla Roman* are not binding precedent and have limited persuasive value. At least one other Circuit has cautioned that *Douglas* should be interpreted narrowly because "a fiduciary relationship is merely one way to demonstrate a position of trust." *United States v. Kidd*, 752 F. App'x 350, 353-54 (7th Cir. 2018). "[A] second category of positions of trust that does not require a fiduciary duty, but instead involves low-level, situation-specific decision-making by an employee with nominal review" can also constitute a position of trust under 3B1.3. *Id.* While Defendant's rank may be considered low in relation to a four-star admiral, his specific role on the Essex had the hallmarks of discretion and authority that 3B1.3 was intended to capture. *Douglas* and *Parrilla Roman* are also at tension with Ninth Circuit precedent. In *United States v. Higa*, the Ninth Circuit affirmed the application of 3B1.3 where an airlines' customer service representative was convicted of smuggling drugs through his airport. 55 F.3d 448 (9th Cir. 1995). Higa's responsibilities "included meeting incoming international flights and checking planes after the passengers had disembarked for things they might have left behind." *Id.* at 450. Despite Higa's relatively low level of responsibility, the district court found (and the Circuit affirmed) that "Higa used his position with the airline to 'gain entry into areas where others could not.'" *Id.* at 453. For the Ninth Circuit, that was enough to apply 3B1.3.

  *Lastly*, Defendant had special engineering skills as a Machinist's Mate that facilitated his crimes. He attended a specialized Navy engineering school for months and continued to receive specialized training from more senior military personnel once he was assigned to the Essex. Defendant's skill at operating a steam propulsion plant on an amphibious assault ship is "not possessed by members of the general public" and required "substantial education, training [and] licensing." Guideline 3B1.3, Application Note 4. Thus, even if the

---

the SECRET level security clearance that Defendant here had because he held a "national security position" as defined under the applicable federal regulations. This is due, in part, to the fact that the defendants in *Douglas* and *Parrilla Roman* worked for private airlines and were vetted to ensure physical access to certain areas of airports, not access to classified national security information like Defendant.

Court has questions about the level of discretion that Defendant had, his special skills as a ship engineer justify the two-level enhancement under 3B1.3.

## ACCEPTANCE OF RESPONSIBILITY

Defendant chose to go to trial, forcing the United States to prove the elements of the crime beyond a reasonable doubt. In fact, Defendant was acquitted of Count 7 of the superseding indictment at the conclusion of the trial. Now, Defendant requests -2 for acceptance of responsibility without citing any case and without explaining how he has accepted responsibility, despite going to trial.

### Relevant Facts

Defendant went to trial, contesting every element of every count. He requested a not guilty verdict, arguing that he lacked the intent to violate the law. In closing, his counsel argued that "intent is everything" and that this case wasn't a big deal, as the documents weren't classified and were more akin to the owner's manual for an old car. He argued that the documents in question were readily available on Facebook and other places and that his client was duped by his sophisticated handler in China.

The jury disregarded those arguments and convicted Defendant of Counts 1-6 of the superseding indictment. However, they found him not guilty of Count 7, the naturalization fraud count.

After conviction, Defendant filed an objection to the pre-sentence report. [ECF 159.] He objected to whether he was ever told that the China Shipbuilding Industry Corporation was state-owned, intimating that he didn't know he was selling secrets to the Chinese government or its agents. He objected to the statement that he sent thousands of pages of technical documents, arguing that "it was never proven at trial and the evidence otherwise fails to show that Mr. Wei sent thousands of pages of documents." [*Id.* at 3.]

He further argued that the PSR's statement that "in exchange for the information, WEI was paid thousands of dollars" was factually incorrect to the extent that it asserted

Defendant directly and intentionally exchanged the information for monetary compensation. [*Id.*]

He further objected to the PSR's statement that "in exchange for the information, (he) was paid thousands of dollars," and that he "sold" at least 30 technical and operating manuals of the U.S. Navy. [*Id.*]

He objected to the characterization of his post-arrest statement, saying that he "did not admit during the interview that his actions were wrong while he was doing them and tried hiding his activities due to the wrongfulness." He argued that he "did not understand the gravity of his actions at the time." [*Id. at 4-5.*] In other words, he didn't know he was doing anything wrong at the time, and therefore didn't commit a crime.

In his sentencing memorandum, his argument as to why he deserves acceptance of responsibility appears to be that it wasn't his fault that he didn't plead guilty and accept responsibility, but that it was the fault of his prior attorney.[4] [Defendant's Sentencing Memorandum at 12, ECF 178.] In other words, he argues that he is not guilty, but would have plead guilty anyway, if not for his prior attorney.

Finally, and most tellingly, Defendant filed a handwritten letter explaining his actions in his own words. [ECF 179-1.] He writes that during an "enormous time for reflection and introspection" what was highlighted to him was not how sorry he was for what he had done, but how "stupid, naive and careless I was." [*Id.*] While he states that he is "truly sorry for what I did," he immediately explains that it wasn't his fault. "Someone built a relationship with me who I wholeheartedly believed to be a friend who shared a maritime interest. I should never share anything with him. I completely understood the gravity of the situation **now**, as well as the nature of the documents, the possible ramifications of those documents have been in the hands of **someone whose true intention was unknown to me**." He claims that his judgement was clouded "regarding friend or foe" and apologizes for "not being

---

[4] Defendant fails to mention that he was also represented by Federal Defenders.

wise, mature, aware enough, wasting taxpayer's money and eroding people's trust in me." [*Id.*, emphasis added.]

### Argument

Defendant is not entitled to a reduction in his sentencing guidelines for acceptance of responsibility, simply because he has not accepted responsibility. It is the defendant's burden to "clearly demonstrate[] acceptance of responsibility" in order to be eligible for a sentencing adjustment under USSG § 3E1.1. The acceptance of responsibility adjustment is not appropriate for those "who put[] the government to its burden of proof at trial by denying the essential factual elements of guilt" and only after being convicted admit guilt. *See* USSG § 3E1.1, application note 2. "In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial." *Id.* This is not one of those rare situations.

"The Sentencing Guidelines allow district courts to grant a two-level downward adjustment to a defendant who 'clearly demonstrates acceptance of responsibility for his offense.'" *United States v. Ramos-Medina*, 706 F.3d 932, 940 (9th Cir. 2013) (quoting USSG § 3E1.1(a)). The defendant bears the burden of making that showing. *Id.* Significant evidence of acceptance of responsibility is a "(1) plea of guilty before trial; (2) truthful admission of the elements of the offense; and (3) truthful admission, or at least no false denial, of 'relevant conduct.'" *United States v. Vance*, 62 F.3d 1152, 1159 (9th Cir. 1995) (citing USSG § 3E1.1 cmt. n.3); *see* USSG § 3E1.1 cmt. n.1.

The acceptance-of-responsibility reduction "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." USSG § 3E1.1 cmt. n.2. Where a defendant "chooses to put the government to its burden of proof at trial," this Court has emphasized that acceptance credit "should be 'rare.'" *United States*

10

*v. Weiland*, 420 F.3d 1062, 1080 (9th Cir. 2005) (quoting USSG § 3E1.1 cmt. n.2). Ordinarily, where a defendant "pleads not guilty and is then convicted," he "will have a difficult time convincing the court that his subsequent acceptance of responsibility ... is anything but a self-serving and insincere expression." *United States v. McKinney*, 15 F.3d 849, 853 (9th Cir. 1994).

In this case, Defendant has not admitted guilt or expressed significant contrition. *See United States v. Osinger*, 753 F.3d 939, 948-49 (9th Cir. 2014). Defendant went to trial, objected to the conclusions in the PSR that he willfully violated the law, and has expressed no remorse, other than getting caught. He still can't admit that he broke the law. His letter to the court acknowledges the facts of what he did but explains that he only understands "now" what he did was wrong when he was fooled by someone whose true intention was "unknown" to him. In other words, he didn't commit a crime, because he did not knowingly violate the law. This is not acceptance of responsibility.

The jury was instructed that, to convict Defendant of espionage and conspiracy to commit espionage, they must find beyond a reasonable doubt that "the defendant had the intent or reason to believe that the information was to be used to injure the United States or to benefit a foreign nation" and that he acted "willfully." [ECF 147 at 26-27.] The other counts of conviction contain similar intent requirements. [*Id.* at 37-38.] In other words, by finding him guilty, the jury didn't believe that Defendant was fooled and that he lacked intent to violate the law. They found, unanimously and beyond a reasonable doubt, that he acted intentionally, knowing that the information he passed could harm the United States or benefit China. While the evidence at trial focused on technical documents, Defendant also passed other information. He provided the ship's location, technical problems on his ship and other ships in the Navy, photographs, recordings, and even the location of the sleeping quarters of the senior leadership. It is ludicrous to suggest that he was unknowingly selling benign information to a maritime enthusiast.

11

Defendant's conduct stands in stark contrast to *McKinney*, 15 F.3d at 850-53, where the defendant "attempted to plead guilty before trial" but "was rebuffed" and "would have entered a guilty plea had the trial judge afforded him an opportunity to do so." *Id.* at 852. In addition, "once at trial, McKinney put on the most minimal and perfunctory of defenses," "did not raise an affirmative defense," and did not "even put on a witness to contest a material part of the government's case," instead relying "almost exclusively on his counsel's elementary questioning on cross-examination." *Id.* The defendant also identified himself to police "[i]mmediately after his arrest," told police where to locate "the gun used in the robbery," and then at the police station "confessed to committing the robbery and explained how he acquired the gun used in the robbery," thereby providing significant "assistance to the authorities." *Id.* at 852-853. No similarly "unusual" factors are present here. *Id.* at 852. After his arrest, Defendant only admitted things once confronted directly and even then, he consistently minimized his conduct. And, as stated above, he still can't acknowledge that he knowingly violated the law.

Defendant also seems to be making an ineffective assistance of counsel argument, in that his previous counsel "failed to discuss possible plea agreements" with him. [Defendant's Sentencing Memorandum at 12.] Defendant was previously represented by both Jason Conforti and the Federal Defenders office. Defendant's assertion is false. However, it is well-established law that that this is neither the time nor the place to address this issue, as the record is undeveloped. He will have the opportunity to address this issue on direct appeal or through a habeas petition when, if necessary, the United States would obtain declarations from his prior counsel and could fully develop the record.

In any event, Defendant chose to hire his own counsel, negotiate with the government, and proceed to trial. That was his choice and now, as has been the pattern throughout this case, he seeks to escape the consequences.

Defendant also asserts that since he was required to plead guilty to a naturalization fraud count, he "could not plead guilty" to the other counts. [*Id.*] This is also false.

Defendant was always free to admit responsibility and plead guilty to any count he chose. He could have pleaded guilty to Counts 1-6 and forced a trial on Count 7. Instead, he took his chances at trial and was somewhat successful, as he was acquitted of the naturalization fraud charge.[5]

This is not the rare case where a defendant is preserving a constitutional right and puts on a cursory defense. He took the risk in taking this case to trial with the hope that he would be acquitted and face no consequences for his actions. Only now, after conviction, does he gingerly take a step down the road of repentance. He hasn't admitted guilt, expressed contrition, explained why his case is the exception to the rule, or explained why going to trial was the only way he could accept responsibility in this case. This is not timely acceptance of responsibility. This is remorse that he was caught and remorse that a jury convicted him. The adjustment should not be given.

## CONCLUSION

For the reasons outlined above, the Court should impose an enhancement for abuse of position of trust and deny a reduction for acceptance of responsibility.

DATED: January 12, 2026                    Respectfully submitted,

ADAM GORDON
United States Attorney

*/s/ John Parmley*
John Parmley
Assistant U.S. Attorney

---

[5] His acquittal does not preclude him from losing his citizenship. The United States can pursue civil denaturalization proceedings.

13